UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

SETH CANNON,                              )
                                          )
              Plaintiff,                  )
                                          )
v.                                        )        No. 3:15-CV-576
                                          )
UNIVERSITY OF TENNESSEE and               )
JIMMY G. CHEEK, in his official           )
capacity,                                 )
                                          )
              Defendants.                 )

## MEMORANDUM OPINION

Plaintiff Seth Cannon previously worked for the University of Tennessee at Knoxville ("UTK") as a Service Aide in the Department of Building Services. He claims that he was terminated because of his disability in violation of the Rehabilitation Act and the Americans with Disabilities Act ("ADA"); that he experienced a hostile work environment based on his disability; that UTK interfered with his rights under the Family and Medical Leave Act ("FMLA"), that he was terminated in retaliation for exercising his FMLA rights; and that he was terminated in retaliation for complaining about disability discrimination.

UTK has moved for summary judgment on all of plaintiff's claims [Doc. 34] with supporting briefs and documentation [Docs. 35, 39] and plaintiff has responded in opposition [Doc. 37]. For the reasons set forth herein, UTK's motion for summary judgment will be **GRANTED**.

## I.     Relevant Facts

UTK hired Seth Cannon as a Service Aide in 2007 for the Department of Building Services [Doc. 34-1 at p. 7]. The Department of Building Services provides professional cleaning services to the UTK and Institute of Agriculture campuses, consisting of approximately 280 buildings and 15 million square feet of space [Doc. 34-2 at ¶¶ 2—3]. Plaintiff reported to an immediate supervisor, who varied over the years, and then to Gordon Nelson, the Assistant Director of Building Services [Doc. 34-2 at ¶ 1].

It is undisputed that Service Aides perform physically demanding work. Each Service Aide is expected to service an average of 35,000 square feet per shift [Doc. 34-2 at ¶ 5]. Thus, a Service Aide must be able to walk at a brisk pace, have a full range of motion, including the ability to stoop, kneel, crouch, and stand, and he or she must be able to lift as much as 50 pounds [*Id.*].[1] According to the position description, a Service Aide is expected to spend 75% of his time cleaning buildings, 10% of his time cleaning and extracting carpet, 10% of his time waxing and buffing floors, and 5% of his time doing construction cleanup [*Id.* at ¶ 6; Doc. 34-2 at p. 12]. Service Aides must be able "to perform hard physical labor for long periods of time" and "operate powered buffers, scrubbers, extractor, etc." [Doc. 34-2 at p. 13]. The specific tasks for a Service Aide include the following:

- Cleans and services assigned areas in buildings.
- Cleans restrooms, offices, and replenishes supplies.

---

[1]Jessica Nelson, formerly known as Jessica Hurt, is a former Service Aide and one of plaintiff's former supervisors [Doc. 34-5 at ¶¶ 1, 3]. Ms. Nelson frequently wears a pedometer at work and estimates that a Service Aide walks between 6.5 and 7 miles, up to 10 miles, per shift [*Id.* at ¶ 4]. Plaintiff agrees that walking was an essential function of his job [Doc. 34-1 at p. 25].

- Picks up trash, empties garbage containers, and removes trash to disposal area, sanitizes trash containers as necessary to meet Health Department requirements.
- Cleans assigned areas by moving furniture, cleans various types of furniture.
- Moves and replaces furniture.
- Scrubs vinyl and concrete floors.
- Vacuums and shampoos carpets, launders microfibers.
- Ability to strip, wax, and buff hard floors, and to know when appropriate.
- Sets up and takes down staging, tables, chairs, wood floors for different events or programs.
- Demonstrates reliability in attendance and punctuality.

[Doc. 34-2 at ¶ 7, p. 15].

In August 2012, plaintiff advised UTK that he suffered from Moersch-Woltman Syndrome ("MWS"), also known as "Stiff Person Syndrome" [Doc. 34-9].[2] MWS is a "rare disease of severe progressive muscle stiffness of the spine and lower extremities" with "muscle spasms triggered by external stimuli or emotional stress" [Doc. 34-4 at p. 17]. Plaintiff described his symptoms as painful muscle spasms all over his body, "resembling a grand mal seizure," with some spasms "so severe they can actually break bones" [Doc. 34-9 at p. 1]. Plaintiff further stated that MWS "comes and goes" and that stress and loud noises can trigger the muscle spasms [*Id*.]. Plaintiff testified that he was diagnosed with MWS by an emergency room physician, but that diagnosis has not been confirmed by any of plaintiff's treating physicians [Doc. 34-1 at pp. 2—3]. Regardless of the accuracy of the diagnosis, UTK does not dispute that plaintiff had an impairment and

---

[2]On August 6, 2012, plaintiff sent a letter to Associate Vice Chancellor of Facilities Services Dave Irvin protesting the denial of a raise due to low scores on his 2011 performance evaluation. In the letter, plaintiff claimed to have provided his supervisors with documentation of his MWS diagnosis as an explanation for his performance.

the record reflects that plaintiff sought treatment for his symptoms from several physicians throughout his tenure at UTK [*see, e.g.*, Doc. 34-7].

Plaintiff had a documented history of problems with his attendance and his performance at UTK and these issues often overlapped.[3]  On October 13, 2011, Cannon received an oral warning for unacceptable attendance because he had incurred absences for which he had no accrued leave [Doc. 34-2 at ¶ 9, p. 17].[4]  As a result of this warning, Mr. Nelson imposed the following requirements for any future medical absences: (1) plaintiff must have enough sick leave to cover the absence; (2) plaintiff must submit a doctor's statement with specific information regarding his condition; (3) and plaintiff must call in prior to the work shift and speak to his foreman, supervisor, or Mr. Nelson as to the absence [Doc. 34-2 at ¶ 10].

On October 20, 2011, Cannon received a written warning for unacceptable work performance after a supervisor observed his "equipment was in the closet and no work had been done" thirty minutes after his shift had started [Doc. 34-2 at ¶ 11, p. 18].  Cannon received a score of 9.5 out of 25 on his 2011 performance review, which is considered a "rarely achieves expectations" rating, and his supervisor stated he needed to "improve on attendance and work performance" [Doc. 34-2 at ¶ 12, pp. 19—20].

---

[3]Mr. Nelson describes plaintiff as a "chronic leave abuser" who "routinely used his leave as quickly as he accrued it and maintained very low leave balances" [Doc. 34-2 at ¶ 50].
[4]Non-exempt employees such as plaintiff receive eight hour of sick leave per month and, initially, eight hours of annual leave per month.  After five years of service, employees receive twelve hours of annual leave per month [Doc. 34-2 at ¶ 4].

On August 21, 2012, plaintiff received a written warning for attendance, and then a final written warning for attendance on April 18, 2013 [Doc. 34-2 at ¶ 13, p. 21]. Cannon received a score of 12 out of 25 on his 2012 performance review, which is considered a "sometimes achieves expectations" rating [Doc. 34-2 at ¶ 14, pp. 22—23]. His supervisor noted that he needed "improvement on his attendance" and "to learn how to use his time wisely and learn how to use the buffer" [*Id.*].

Jessica Nelson supervised plaintiff from August 27, 2012 to May 5, 2014 [Doc. 34-5 at ¶ 5]. She describes his attendance as follows: "very poor" and "very unreliable," "he moved too slowly to complete the responsibilities ordinarily assigned to Service Aides," and "he did not clean with the level of professional detail that is expected of Building Services" [*Id.*]. In sum, she observed that plaintiff "rarely, if ever, did his job well and often seemed completely disinterested in working" [*Id.*]. Ms. Nelson gave plaintiff a score of 11 out of 25 on his 2013 performance review [*Id.* at ¶ 6; Doc. 34-5 at pp. 4—8]. Ms. Nelson's comments on his performance review included the following: plaintiff "is not often able to finish task [*sic*] that he has been given to do for his everyday job," is "not often able to perform his daily job duties and complete his job assignments for the day," "I can not count on Seth to be at work on a daily basis," "Seth will leave work early and has missed a lot of time this past year," and "Seth is often not here and you can not count on him to be here [*Id.*]. Ms. Nelson states that she did not consider the 344.6 hours of FMLA leave against plaintiff in scoring his dependability for the performance review, but she did consider the 302 hours of non-FMLA absences for the year [Doc. 34-5 at ¶ 10]. Because of his low performance review score, Ms. Nelson completed a performance improvement

plan for plaintiff which stated that he needed to "[p]rovide professional cleaning service to the area to which you're assigned" [Doc. 34-5 at ¶ 11; pp. 9—11].

Plaintiff applied for intermittent FMLA leave on April 21, 2013 and his request was approved shortly thereafter [Doc. 34-6 at ¶¶ 4—5]. He exhausted his 480-hour (12 weeks) FMLA leave entitlement on February 20, 2014 [Doc. 34-2 at ¶ 16; Doc. 34-6 at ¶ 9, p. 17]. Around September 29, 2014, plaintiff contacted UTK Human Resources to inquire about his eligibility for additional FMLA leave. After reviewing his attendance records, Human Resources concluded that he had not worked enough hours in the preceding 12-month period to be eligible for FMLA [Doc. 34-6 at ¶ 10]. In fact, from the exhaustion of his FMLA leave in February 2014 until the termination of his employment, plaintiff never had enough hours of service in the preceding 12-month period to be eligible for FMLA leave [Doc. 34-6 at ¶ 11].

On August 8, 2013, plaintiff sent an email to the UTK ADA Coordinator, Jennifer Richter, regarding his health issues and possible accommodations under the ADA [Doc. 34-4 at ¶ 4, p. 6]. Plaintiff met with Ms. Richter on August 15, 2013, and advised, "he has muscle spasms that keep him from walking correctly," "he can lose his balance and his legs are stiff," and "he cannot lift weight" [Doc. 34-4 at ¶ 6].[5] He suggested that periodic breaks and additional leave would help him perform his job [*Id.* at ¶ 7]. Plaintiff did not return the completed ADA Accommodation Certification to Ms. Richter until April 14,

---

[5]Ms. Richter states that plaintiff's description of his physical limitations caused her to question whether he was able, with or without reasonable accommodation, to perform the essential functions of a Service Aide [Doc. 34-4 at ¶ 6].

2014. On that form, plaintiff's physician indicated that he suffered from "severe pain to lumbar spine, severe muscle spasms to mainly truncal muscles due to Stiff Man Syndrome and multiple disc herniations that causes the cord to be [contracted]" [Doc. 34-4 at ¶ 13, p. 11]. The form indicated that plaintiff had permanent limitations in "lifting, pulling, tugging, bending, standing for long periods" and he had difficulty "sweeping, mop, vacuum, bending for long periods of time, lifting heavy objects – trash" [Doc. 34-4 at ¶ 14, p. 11]. Notably, the Accommodation form stated that no possible job accommodations could improve his job performance [Doc. 34-4 at ¶ 16; p. 12].

During the summer of 2014, Aaron Nichols supervised plaintiff. Mr. Nichols advised Mr. Nelson that plaintiff had missed work despite having no sick leave to cover his absence and plaintiff had exhausted his FMLA leave [Doc. 34-2 at ¶ 20]. Thus, Mr. Nelson gave plaintiff an oral warning for attendance and imposed the same three requirements for medical absences as stated above [*Id.*]. After missing work on July 1 and 7, 2014 with no accrued leave to cover his absences, plaintiff received a written warning regarding his attendance [Doc. 34-2 at ¶ 21, p. 24]. Plaintiff missed work again on July 15, 2014, also without any accrued leave to cover the absence, and he received a final written warning regarding his attendance [Doc. 34-2 at ¶ 22, p. 25].

On July 24, 2014, plaintiff sent an email to UTK Human Resources complaining of "discrimination, unfair treatment and targeting, corruption and lies" [Doc. 34-17]. Plaintiff's email recounted his diagnosis of MWS, asserted that his July 7 absence was the result of confusion with his supervisor and that his July 15 absence was the result of confusion about his sick leave balance [*Id.*]. Plaintiff suggested that a reasonable

accommodation, per the ADA, would be that he receive leave without pay or use annual leave for the "rare days I have no choice but to miss" [*Id.* at p. 3]. He further claimed that he was being punished for missing work due to "medical issues beyond my control" and low scores on his performance reviews "based purely upon the fact that I am physically unable to move as fast as my supervisors want me to move, or feel I should be able to move" [*Id.*].

Because he was on final-warning status, plaintiff's absence without leave on August 1, 2014 triggered a pre-termination letter pursuant to UTK policy and he was placed on leave with pay [Doc. 34-2 at ¶ 23, p. 26]. Mr. Nelson then learned of plaintiff's July 24 email complaint of discrimination to Human Resources [*Id.* at ¶ 24]. Thus, Mr. Nelson suspended the pre-termination process on August 8, 2014, to allow plaintiff time to work through the accommodation process with Ms. Richter [Doc. 34-2 at ¶ 24, p. 27]. Plaintiff was placed on leave without pay effective August 11, 2014 [*Id.*].

Also on August 8, 2014, Mr. Nelson received an email from Joe Cagle, the Material Control Supervisor for the Institute of Agriculture, complaining about plaintiff's performance [Doc. 34-2 at ¶ 25, p. 28]. Mr. Cagle noted, "Rarely did I find him doing anything but sitting in a chair beside the window doing something on his cell phone which was plugged in a wall outlet" [*Id.*]. Mr. Cagle's department also received a complaint that plaintiff spent a lot of time just sitting in the Graduate Student offices [*Id.*]. Further, on eight or nine occasions, Mr. Cagle observed plaintiff sitting in the back of an empty classroom with the blinds closed and the lights turned off [*Id.*].

Plaintiff met with Ms. Richter again on August 14, 2014 and stated that he wanted an electric, or "bubble," car to transport trash from buildings to dumpsters and that he wanted his area of responsibility to be reduced [Doc. 34-4 at ¶¶ 18—19]. Ms. Richter directed plaintiff to provide supplemental medical documentation of his abilities, because the Accommodation form he previously provided indicated that he could not do the fundamental components of his job and there were no possible accommodations to assist him [*Id.* at ¶ 24]. After consulting with plaintiff's department, Ms. Richter proposed several accommodations for plaintiff. First, he was allowed to take short breaks to take medication or deal with breakthrough pain so long as the breaks were reasonable in length and the medications did not impair his ability to do his job [Doc. 34-4 at ¶ 25]. As for his request for a bubble car, Ms. Richter did not find that necessary as he could move trash into the large receptacle bag by bag or in smaller incremental amounts [*Id.* at ¶ 26]. Finally, Ms. Richter agreed that plaintiff could use any accumulated annual leave or earned personal days without pre-approval for days when he was sick or had a medical appointment but had no accumulated sick leave [*Id.* at ¶ 27]. These proposed accommodations were ultimately agreed to by the Building Services department on October 6, 2014 [Doc. 34-4 at ¶ 31, pp. 26—27]. Following a meeting on October 9, 2014 with plaintiff, Mr. Nelson advised plaintiff by letter of October 10, 2014, of the accommodations and requirements for his return to work on October 13, 2014 [Doc. 34-2 at ¶ 26, p. 29].

Upon his return to work, plaintiff was assigned to clean an area of the Agriculture campus [Doc. 34-2 at ¶ 26, p. 29]. At this time, plaintiff's supervisor, Sheena Rhea, worked

with him for the first two days in order to provide him with orientation and instruction to the space [Doc. 34-2 at ¶ 27]. Following these two days, Ms. Rhea informed Mr. Nelson that plaintiff "laughed when I tried to talk to him about his speed and the fact that we did only one half of the duties he will be responsible for on a daily basis. He was not concerned in the least" [Doc. 34-2 at ¶ 27; Doc. 34-3 at ¶¶ 10—11, p. 6]. She further estimated that plaintiff "accomplished 35-40% of the duties expected of him" [*Id.*].

On October 16, 2014, Ms. Rhea observed that plaintiff was not where he had reported himself to be and she found him hiding in a room with his work shoes off [Doc. 34-2 at ¶ 28; Doc. 34-3 at ¶ 12, p. 7]. Accordingly, Mr. Nelson issued plaintiff a final written warning for unsatisfactory work performance on October 20, 2014, which advised that his continued failure to perform his assigned work and comply with break guidelines would result in termination [Doc. 34-2 at ¶ 29, pp. 30—31]. Subsequently, Ms. Rhea informed Mr. Nelson of further performance deficiencies on October 28 and 29, 2014, where plaintiff had neglected to clean bathrooms, vacuum floors, and empty trash [Doc. 34-2 at ¶¶ 30—31; Doc. 34-3 at ¶¶ 13—15].

Plaintiff suffered a workplace injury by twisting his ankle on October 31, 2014, and he was placed on unpaid administrative leave to recover [Doc. 34-2 at ¶ 32; Doc. 34-2 at ¶ 18]. He returned to work on light duty on December 10, 2014, separating batteries, work which could be performed without standing or walking [*Id.* at ¶ 33]. Plaintiff attended a training class on December 17, 2014, where, according to Ms. Rhea, "he showed absolutely no interest in the information and did not participate," he was "disruptive and totally

disrespectful to the department he works for," and showed "a total disregard for his job and the rules that are associated with his job" [Doc. 34-2 at ¶ 34, p. 32].

Plaintiff had medical appointments on December 16 and 18, 2014, and he took the entire day off for each. Mr. Nelson again issued plaintiff a final written warning on December 19, 2014 and counted those absences as leave without pay [Doc. 34-2 at ¶ 35, p. 33]. Plaintiff was advised that failure to return to work after a medical appointment or to give advance notice to his supervisor of an appointment would result in termination [*Id.*].

On January 6, 2015, plaintiff was released to work for four hours of regular duty and four hours of light duty per day [Doc. 34-2 at ¶ 36]. On January 22, 2015, Ms. Rhea provided Mr. Nelson with photographs of plaintiff's work area showing that he had not mopped, dirty bathrooms, overflowing recycling bins, and areas that were clearly unswept and in disarray [Doc. 34-2 at ¶ 37; Doc. 34-3 at ¶ 20]. Thus, Mr. Nelson issued plaintiff a final written warning on January 23, 2015, for unsatisfactory work performance and advised that any further failure of this type would result in termination [Doc. 34-2 at ¶ 38, p. 34]. On January 25, 2015, plaintiff complained to Human Resources about this final warning and the December 19, 2014 final warning regarding attendance by stating that these warnings violated the terms of his accommodation agreement because he had sufficient annual leave to cover both absences [Doc. 34-2 at ¶ 39].

On January 26, 2015, Mr. Nelson received an email from Wally Beets, General Superintendent in Air Conditioning Services, requesting that Mr. Nelson "get someone to clean our restrooms in the A/C shop area … They are both a little haired over" [Doc. 34-2 at ¶ 40, p. 35]. Later that afternoon, after plaintiff claimed to have cleaned the A/C shop

area, Ms. Rhea reported that plaintiff "did not clean the restrooms, recycle, fill soap dispensers, or clean the water fountains. The floors did not appear to have been mopped" [Doc. 34-2 at ¶ 41; Doc. 34-3 at ¶ 22]. Mr. Nelson opined that the pictures sent by Ms. Rhea "revealed an area that had been completely neglected over multiple days" [*Id*.]. Two days later, Ms. Rhea reported that she inspected plaintiff's entire area of responsibility and found that he had completely neglected to clean any of his assigned areas [Doc. 34-2 at ¶ 42; Doc. 34-3 at ¶ 23].

At this point, Mr. Nelson concluded that plaintiff was unwilling to perform his job duties and he placed Cannon on administrative leave with pay on January 28, 2015, to initiate the termination process [Doc. 34-2 at ¶ 43, p. 36]. On February 2, 2015, Mr. Nelson responded to plaintiff's January 25, 2015 complaints as to the two final written warnings. Upon review, plaintiff's pay was adjusted for the December 16 and 18, 2014 absences, but the warning was not rescinded because plaintiff still went to a doctor's appointment and failed to return to work without telling his supervisor [Doc. 34-2 at ¶¶ 44—45, pp. 37—39]. Further, Mr. Nelson advised that rescission of the attendance warning was "inconsequential" and "would not affect the current situation, which is that we believe your employment should be terminated based on continued unsatisfactory work performance … those failures have resulted in verbal and written complaints from your customers" [*Id*.].

Following a pre-termination hearing on February 10, 2015, Mr. Nelson consulted with UTK's Office of Human Resources and concluded that "the University had fully met Cannon's disability accommodation demands and that he, nonetheless, was failing to do his job. I do not know whether his performance was related to physical limitations or not.

I simply knew we had accommodated him and he still was not performing acceptably"
[Doc. 34-2 at ¶¶ 46—48]. Mr. Nelson terminated plaintiff's employment on February 11,
2015 [Doc. 34-2 at ¶ 49, p. 40]. Despite the many issues related to plaintiff's attendance,
Mr. Nelson states he did not terminate plaintiff for attendance, but because his performance
"was far below the professional cleaning standards we expect from our Service Aides. He
rarely completed service on his assigned areas and, when he did, the quality of service was
deficient" [Doc. 34-2 at ¶¶ 50—51].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper
"if the movant shows that there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears
the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir.
1993). All facts and all inferences to be drawn therefrom must be viewed in the light most
favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once
the moving party presents evidence sufficient to support a motion under Rule 56, the
nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis
Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991)
(citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a
particular element, the non-moving party must point to evidence in the record upon which

a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.   FMLA Claims

The FMLA enables covered employees to take up to twelve weeks of leave per year for various purposes specified in the statute, including caring for a family member with a serious health condition or for the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C) & (D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). At the expiration of the employee's leave

period, he must be reinstated to his position or to a position equivalent in pay, benefits, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1).

The Sixth Circuit recognizes two distinct theories of wrongdoing under the FMLA. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012); *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555–56 (6th Cir. 2006). The "entitlement" or "interference" theory arises from §§ 2615(a)(1) and 2614(a)(1), which make it unlawful for employers to interfere with or deny an employee's exercise of his FMLA rights (§ 2615(a)(1)), and which require the employer to restore the employee to the same or an equivalent position upon the employee's return (§ 2614(a)(1)). *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir. 2003). The "retaliation" or "discrimination" theory, on the other hand, arises from § 2615(a)(2), which prohibits an employer from discharging or discriminating against an employee for "opposing any practice made unlawful by" the Act. *Id.* at 401. Cannon has alleged claims under both theories [Doc. 28 at ¶¶ 37—42].

A.    FMLA Retaliation

Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Seeger*, 681 F.3d at 283. To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) this exercise of his protected rights was known to the defendant, (3) he suffered an adverse employment action, and (4) there was a causal connection between the adverse employment action and the protected activity. *Tennial v. United Parcel Serv., Inc.*, No. 15-6356, 2016 WL 6156315, at *9 (6th Cir. Oct. 24, 2016). If the plaintiff satisfies his

prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Seeger*, 681 F.3d at 284. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. *Id.* at 285. "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (alteration in original).

Although neither party specifies this, it appears that the only prima facie element in dispute is whether plaintiff can establish a causal connection. In order to establish a causal connection, a plaintiff must show some type of retaliatory intent. *Tennial*, 2016 WL 6156315, at *9. An FMLA retaliation claim accordingly centers around "[t]he employer's motive … because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 508 (6th Cir. 2006) (emphasis in original).

In support of this claim, plaintiff relies on the 2013 performance evaluation, completed in April 2014, the score of "1" for dependability, and Ms. Nelson's comment that she "can not count on Seth to be at work on a daily basis" [Doc. 34-1 at p. 26; Doc. 34-5 at pp. 4—8]. Plaintiff testified that it was "unfair to put a low score and say, just blankely (sic) that I'm not reliable to come in" because some of his absences in 2013 were FMLA-protected [Doc. 34-1 at p. 26]. He states "everything, that entire thing is the reason why" he believes he was retaliated against [Doc. 34-1 at p. 27].

UTK responds that both Ms. Nelson and Mr. Nelson testified that she was instructed to disregard plaintiff's FMLA absences and she did so. UTK also notes that plaintiff missed 302 hours (37 days) in 2013 that were not FMLA-protected. Thus, UTK argues there is no inference that plaintiff's low rating for dependability was attributable to his FMLA leave and not his other unprotected absences [Doc. 35 at pp. 20—21]. Plaintiff argues the opposite – that the inference must be that Ms. Nelson considered his FMLA absences in evaluating his performance and that there is no evidence to prove that she and Mr. Nelson analyzed his absences as they have stated [Doc. 37 at pp. 3—4]. In reply, UTK points out that Mr. Nelson's and Ms. Nelson's testimony is unrefuted and that plaintiff missed 133.3 hours in 2013 *before* he applied for FMLA and the remaining unprotected 2013 absences were because he failed to notify his department that he was taking FMLA leave [Doc. 39 at pp. 8—9].

Plaintiff has presented no evidence of retaliatory intent with respect to his FMLA leave. He applied for, and was approved for, FMLA leave in April 2013, and exhausted his FMLA leave entitlement in February 2014. Ms. Nelson claims that she was instructed to disregard plaintiff's FMLA-protected absences in evaluating his 2013 performance and that she did so. Mr. Nelson confirms this testimony and plaintiff has presented no evidence to refute it. *See Anderson*, 477 U.S. at 248 (the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor).

Even if the Court were to infer that Ms. Nelson's comments and his performance evaluation score were really about his FMLA absences, plaintiff has presented no evidence that the 2013 attendance score was connected to his termination in 2015. *See Tennial*, 2016

WL 6156315, at *9 ("Temporal proximity of more than six months, standing alone, has not been found to support an inference of retaliatory discrimination absent other compelling evidence") (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566—67 (6th Cir. 2000)); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment, act, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality"). In short, there is simply no evidence to support a finding that Cannon's use of FMLA leave was UTK's "true motivation" for terminating him. Accordingly, UTK is entitled to summary judgment on the FMLA retaliation claim.

B. FMLA Interference

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA right. 29 U.S.C. § 2615(a)(1). "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 447 (6th Cir. 2007). To establish a prima facie case of FMLA interference, plaintiff must show that (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012); *Killian*, 454 F.3d at 556. As with the retaliation claim, the *McDonnell Douglas* framework

18

applies, meaning that the employer must respond to the prima facie case with evidence that "it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee," whereupon the plaintiff must show pretext. *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 351 (6th Cir. 2013) (quoting *Donald*, 667 F.3d at 762).

UTK argues that plaintiff cannot establish either the third or the fifth element of his claim because he was never denied FMLA leave to which he was entitled. As set forth above, plaintiff applied for and was approved for intermittent FMLA leave in April 2013 and he exhausted the full amount of FMLA leave in February 2014. When he next inquired about FMLA leave, in September 2014, plaintiff had worked only 1,129.5 hours in the preceding 12 months and was therefore ineligible for FMLA leave. Per UTK's Human Resources department, at no point from the time of his exhaustion of FMLA leave until his termination did plaintiff become eligible for FMLA leave. Accordingly, UTK argues that plaintiff received all the FMLA benefits to which he was entitled and there is no basis for his interference claim [Doc. 35 at pp. 24—25].

In response, plaintiff contends that UTK interfered with his FMLA rights when Gordon Nelson mistakenly told plaintiff he could not reapply for FMLA leave until he worked 1,600 hours from when his prior FMLA period ended.[6] Plaintiff also argues that UTK interfered with his FMLA rights when he was placed on leave without pay for two months (August 8 through October 13, 2014) during the ADA interactive process and then

---

[6] It is undisputed that the FMLA and UTK policy state that an employee must have worked at least 1,250 hours in the preceding 12 months to be eligible for FMLA leave. 29 U.S.C. § 2611(2)(A)(ii); Doc. 34-6 at ¶ 10; Doc. 34-6 at p. 18.

"counted that leave against him" because it made him ineligible for FMLA leave [Doc. 37 at pp. 5—7]. Plaintiff asserts that as of April 22, 2014, he had worked approximately 1,366.8 hours in the preceding 12 months and was therefore eligible to reapply for FMLA [Doc. 37 at p. 5]. However, there is no explanation as to the basis for this calculation and it is not evident from the exhibits provided [Doc. 37-5].[7] *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (conclusory allegations unsupported by specific evidence are insufficient to establish a genuine issue of material fact). UTK does not respond to this or the assertion regarding plaintiff's period of leave without pay, but merely asserts that only Human Resources can grant FMLA leave and plaintiff was never eligible for FMLA at any point after his FMLA entitlement expired in February 2014 [Doc. 39 at p. 9].

To qualify as an "eligible employee" under the FMLA, the employee must have been employed "for at least 1,250 hours of service … during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Although the FMLA does not define the term "hours of service," the FMLA's implementing regulations clarify that "[t]he determining factor is the *number of hours an employee has worked* for the employer within the meaning of the FLSA [Fair Labor Standards Act] …. [A]ny accurate accounting of *actual hours worked* under FLSA's principles may be used." 29 C.F.R. § 825.110(c)(1) (emphasis added). Thus, to qualify as an "eligible employee" under the FMLA, plaintiff has the burden must prove

---

[7]Plaintiff has submitted copies of his leave records from 2013 and 2014 [Doc. 37-5], which indicate the amount of and types of leave he used. However, save for a handwritten notation of regular hours worked between September 29, 2013 – September 29, 2014, these documents do not indicate the days or hours worked. Instead, the records indicate *some* of the hours he did not work, but there is no accounting for days or hours when plaintiff was not scheduled to work and was not on any type of leave.

that he actually worked 1,250 hours in the 12 months prior to his request. *Saulsberry v. Fed. Exp. Corp.,* 552 F. App'x 424, 429 (6th Cir. 2014); *Webb v. U.P.S., Inc.*, No. 3:06-CV-176, 2007 WL 2903916, at *5 (E.D. Tenn. Oct. 2, 2007).

The record contains the unrefuted testimony from UTK's Human Resources department that plaintiff never became eligible for FMLA leave again after the expiration of his leave entitlement in February 2014 because he never worked 1,250 in any 12-month period. Thus, accepting plaintiff's testimony as true that Mr. Nelson misstated the standard for FMLA eligibility, plaintiff nevertheless was not eligible for FMLA. Plaintiff's unsupported assertion that he worked enough hours to become eligible is insufficient to create a genuine issue of disputed fact. Indeed, as to his FMLA interference claim, plaintiff testified that he "couldn't come up with anything that would be done different" [Doc. 34-1 at p. 27]. Accordingly, UTK is entitled to summary judgment as to plaintiff's FMLA interference claim.

## IV.    ADA/Rehabilitation Act Claims

Plaintiff asserts claims of disability discrimination and retaliation under the ADA and the Rehabilitation Act, and a claim of a disability-based hostile work environment under the Rehabilitation Act [Doc. 28 at ¶¶ 20—36]. Both statutes prohibit discrimination against a qualified individual with a disability, s*ee* 42 U.S.C. § 12112(a) (prohibiting discrimination "against a qualified individual on the basis of disability"); 29 U.S.C. § 794(a) (prohibiting discrimination against a "qualified individual with a disability … solely by reason of his or her disability"), and they are construed similarly. *Babcock v. Michigan*,

812 F.3d 531, 540 (6th Cir. 2016); *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002).

A plaintiff may prove that he was discriminated against based on his disability either through direct or indirect evidence. *Hedrick v. W. Reserve Case Sys.*, 355 F.3d 444, 453—54 (6th Cir. 2004). Plaintiff has presented no direct evidence of disability discrimination so his claims must be reviewed under the *McDonnell Douglas* burden-shifting framework. *Id.* at 452—53. To state a prima facie case of discrimination under the ADA, the plaintiff must establish that: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) the disabled individual was replaced. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).[8] Furthermore, the plaintiff's disability must be a "but for" cause of the adverse employment action under the ADA, and the sole cause of the adverse action under the Rehabilitation Act. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317—18 (6th Cir. 2012) (en banc); *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011) (the Rehabilitation Act prohibits discrimination "solely" on the basis of disability).

---

[8]The prima facie elements under the Rehabilitation Act are: (1) the plaintiff is a "handicapped person" under the Act; (2) the plaintiff is "otherwise qualified" for participation in the program; (3) the plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) the relevant program or activity is receiving Federal financial assistance. *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013).

A.    <u>Whether Plaintiff was a Qualified Individual with a Disability</u>

UTK challenges whether plaintiff can satisfy the second element of a prima facie case of disability discrimination under either the ADA or the Rehabilitation Act, whether he is not a qualified individual with a disability, because he could not perform the essential function of his job with or without reasonable accommodation.  In support of this argument, UTK points to plaintiff's sworn statements to the Social Security Administration in support of his application for disability benefits, his statements to the University, the observations of plaintiff's doctors in his medical records, and the observations of his supervisors [Doc. 35 at pp. 13—18].

Plaintiff responds by asserting that he was capable of performing the duties of his job with accommodation.  He further contends that he "satisfied the attendance policy"[9] and that UTK failed to consider the positive evaluations of his work performance.  Plaintiff points to the deposition testimony of Mr. Nelson, Mr. Caudill, and Ms. Rhea that they believed he was physically capable of performing his job, that plaintiff himself believed he could do the job, and that his doctors opined that he was capable of performing the job.  Finally, plaintiff contends that he applied for Social Security disability benefits prior to the diagnosis of Stiff-Person Syndrome and receipt of a medication regimen to control his pain and symptoms and four years prior to his termination [Doc. 37 at pp. 25—28].

---

[9]Even assuming that plaintiff was correct in this assertion, which is doubtful given the numerous references to attendance issues in the record, the plaintiff's ability to "satisfy" the attendance record does not mean that he is physically capable of performing the essential functions of the Service Aide job, with or without accommodation.

A plaintiff is "disabled" under the ADA if he (1) has a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities; (2) the plaintiff has a record of such impairment; or (3) the plaintiff is regarded by an employer as having such an impairment.[10]  *Gruener v. Ohio Cas. Ins. Co.,* 510 F.3d 661, 664 (6th Cir. 2008) (citing *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 810 (6th Cir. 1999)) (quotations omitted); *see also* 42 U.S.C. §§ 12102(1)(A)-(C).  It is undisputed that walking is a major life activity, 42 U.S.C. § 12102(2)(A), and that it is an essential function of the Service Aide position.  While there is no definite amount of time or distance that a Service Aide walks per shift, Ms. Nelson estimates that she walked between 6.5 and 7.0 miles per shift as a Service Aide.  Further, the Service Aide position description requires the employee to be able "to perform hard physical labor for long periods of time" and to clean restrooms, pick up trash, scrub floors, and vacuum carpets [Doc. 34-2 at pp. 11—16].

A qualified individual with a disability is one who, with or without reasonable accommodation, can perform the essential functions of the job and it is the plaintiff's burden to prove he can meet this criteria.  42 U.S.C. § 12111(8); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  If the plaintiff's disability renders him unable to perform an essential function of his job, then he is not a "qualified individual" protected by the ADA.  *Wagner v. Sherwin-Williams Co.*, 647 F. App'x 645, 647 (6th Cir. 2016).  "Neither application for nor receipt of social security benefits is by itself conclusive evidence that an individual is completely incapable of working." *Stallings v. Detroit Pub.*

---

[10]Plaintiff makes no argument that he was regarded as disabled or that he had a record of impairment such as to make him disabled under the ADA.

*Sch.*, 658 F. App'x 221, 226 (6th Cir. 2016) (quoting *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 429 (6th Cir. 2014)).  Instead, "a plaintiff's sworn assertion in an application for disability benefits that [he] is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if [he] does not offer a sufficient explanation. *For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, [he] must proffer a sufficient explanation*."  *Cleveland*, 526 U.S. at 806 (citation omitted, emphasis added). For instance, an ADA plaintiff can survive summary judgment by explaining that he can perform the essential functions of his position with a reasonable accommodation—a consideration the Social Security Administration's (SSA's) disability determination does not take into account. *See, e.g., Olds v. United Parcel Serv., Inc.*, 127 F. App'x 779, 783–84 (6th Cir. 2005); *see also Cleveland*, 526 U.S. at 807.  Further, plaintiff's explanation must be "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of [his] job, with or without 'reasonable accommodation.'"  *Cleveland*, 526 U.S. at 807.

In the March 17, 2011 function report for Social Security disability benefits, plaintiff stated that:

- "Agonizing pain and muscle spasms prevent me from standing or even walking normally for any length of time." [Doc. 34-19 at p. 2]
- "I am often unable to stand in the shower" [Doc. 34-19 at p. 3]
- "I can only slowly walk for a couple minutes, climbing more than a few stairs more than a couple times is incredibly difficult.  Standing causes agony, very quickly, as does squatting."  [Doc. 34-19 at p. 7]

- Plaintiff can walk for "a couple minutes" before needing to stop and rest for "at least 20-25 minutes." [Doc. 34-19 at p. 7]
- "Standing up does cause a lot of pain. When I stand after sitting for only a couple minutes, I can barely stand it. It causes fierce pain and a discomfort similar to "pins and needles." Lifting more than 10 lbs causes a lot of pain. Bending and kneeling cause pain when I start to get up from the position." [Doc. 34-19 at p. 9]

In the February 24, 2012 function report for Social Security disability benefits, plaintiff stated that:

- "Stiff Person Syndrome has seriously affected the strength I have, especially in my legs. My mobility has become even more limited. The muscle spasms are constant and make everything difficult." [Doc. 34-19 at p. 10]
- "I now have to use a shower chair in the shower due to the weakness and pain in my legs." [Doc. 34-19 at p. 11]
- "I do have difficulty trying to stand and shave." [Doc. 34-19 at p. 11]
- "Leaning against the wall is now necessary in order to use the toilet." [Doc. 34-19 at p. 11]
- "When grocery shopping, I require a wheelchair." [Doc. 34-19 at p. 13]
- "Lifting more than 10-15 pounds causes my arms and back to hurt and spasm. I cannot squat at all. I can only sit and stand for around 10-20 minutes at the most. Kneeling is nearly impossible, it's very difficult to get up. Climbing stairs is highly painful, and it takes me a while to go up and down steps." [Doc. 34-19 at p. 15]
- Plaintiff answered that he could walk "15-20 feet" before needing to stop and rest and he could resume walking after "10 minutes." [Doc. 34-19 at p. 15]

On both reports, plaintiff stated that he needed a cane [Doc. 34-19 at pp. 8, 16]. In appealing the denial of his application, plaintiff stated, "I have tried to walk as long as I could, I just can no longer walk, the pain and complications are too severe." [Doc. 34-19 at p. 29].

Plaintiff told Mr. Irvin in August 2012, that he "can barely talk or walk" due to the symptoms of Stiff Man Syndrome [Doc. 34-9]. In August 2013, plaintiff told Ms. Richter that he had muscle spasms that kept him from walking correctly and, a month later, that he

suffered an injury from walking 30 minutes to his building on a football game day [Doc. 34-4 at ¶¶ 6, 11]. Mr. Nelson observed plaintiff walking with a cane and testified, "no one who required a cane could walk at a sufficient pace to fulfill the duties of a Service Aide" [Doc. 34-2 at ¶ 59]. Ms. Rhea observed that plaintiff "moved much too slowly to complete the typical tasks of a Service Aide. His gait, his motions, and his pace of cleaning were all very slow. Further, he seemed very reliant on his wheeled trash barrel for support and balance" [Doc. 34-3 at ¶ 7]. Ms. Nelson observed plaintiff "moved too slowly to complete the responsibilities ordinarily assigned to Service Aides" [Doc. 34-5 at ¶ 5]. Thus, his statements to University officials and their observations of his performance indicate that he is not capable of performing the duties of a Service Aide.

The record also contains several statements by plaintiff to his doctors and their observations of his abilities. In September 2013, plaintiff told Dr. Ayers that he was "barely able to move" and "can only lie [on] his back or left side" [Doc. 34-7 at p. 1]. In January 2014, Dr. Fox observed that plaintiff's "[f]unctional impairment is severe [and] interferes with most, but not all daily activities" and plaintiff demonstrated "hesitancy in movement, limps" [*Id*.]. In March, April, and May 2014, plaintiff told Dr. Fox that working full time was "becoming … more difficult" [*Id*. at pp. 1—2]. In August 2014, plaintiff described his functional impairment to Dr. Fox as "severe" and Dr. Fox observed plaintiff had "hesitancy in movement, uses cane" [*Id*. at p. 2]. In September 2014, Dr. Ayers opined that plaintiff "needs to be able to sit down as necessary" and "encouraged pursuing education that would allow him to do something clerical and less physical" [*Id.*

at p. 3].[11]  In November, plaintiff's "[m]obility is worse [and] ambulates with assistance from bilateral crutches" [*Id.*].  Again, in December 2014 and January 2015, Dr. Fox reported that plaintiff's mobility was "worse" and that he ambulated "with assistance from a four point cane" [*Id.* at pp. 3—4].  In January 2015, plaintiff reported to Dr. Fox "My back kills me, even just working 4 hours a day" [*Id.* at p. 4].

On the other hand, plaintiff has submitted evidence from some members of the University community that he performed well as a Service Aide.  Matt Kredich, Head Swimming Coach, wrote that plaintiff did "exemplary" work and showed "a real attention to detail" in the Aquatic Center [Doc. 37-34].  Brenda Anderson, in the Parking and Transit office, commented that plaintiff was "doing a great job in keeping up our offices" [Doc. 37-35].  Similarly, Jill Brown, from the Parking and Transit Services Permit Office, reported that plaintiff was doing "a great job" and "providing a wonderful service to the University" [Doc. 37-36].  Finally, Tom Anderson, Central Supply Team, advised that plaintiff "performed well in the time he was given" and his performance was "acceptable" [Doc. 37-37].  Although UTK is dismissive of these comments as not representative of the overall quality of his performance, they are some evidence that plaintiff was capable of performing the essential functions of his job.

The Court disagrees with plaintiff's assertion that the statements in support of his SSDI application are "inconsequential" and have "no bearing on his ability to work four

---

[11]As part of the accommodation process, Dr. Ayers wrote the University that, "As long as [plaintiff] stays on his medication and as long as he is able to stop and rest as he needs to, then I think that Mister Cannon will be able to perform the responsibilities of his job." [Doc. 34-4 at p. 25].

years later" [Doc. 37 at p. 28]. Plaintiff's statements are not conclusive evidence that he cannot walk sufficiently to perform the essential functions of his job, but they are persuasive evidence. Similarly, his statements to his doctors and University officials and their observations about his abilities are persuasive evidence of his inability to perform the duties of a Service Aide. They are not sworn statements by plaintiff that contradict his sworn statements to the Social Security Administration as contemplated by the *Cleveland* opinion, but they are some evidence of his ability to do the Service Aide job. In contrast, plaintiff points to testimony from Mr. Caudill, Ms. Rhea, and Mr. Nelson that each believed plaintiff was physically capable of doing the job. Plaintiff also asserts, "[h]e simply needed an accommodation" in order to perform the Service Aide job [Doc. 37]. The record reflects, and plaintiff does not dispute, that UTK offered several accommodations to assist him in the performance of his duties.

In light of the evidence on both sides of this coin, the Court cannot weigh the evidence and determine as a matter of law whether plaintiff was a qualified individual as required by the ADA. *See Anderson*, 477 U.S. at 249. Accordingly, the Court will assume for purposes of the pending motion that plaintiff can satisfy the elements of a prima facie case of disability discrimination.

B.  Whether Plaintiff Can Establish a Prima Facie Case of Disability Based Hostile Work Environment

Plaintiff alleges that he was subject to harassment by his supervisors based on his disability in violation of the Rehabilitation Act [Doc. 28 at ¶¶ 24—27]. To establish a prima facie case of hostile work environment under the Rehabilitation Act, plaintiff must

show: (1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) defendant either knew or should have known about the harassment and failed to take corrective measures. [12] *Spence v. Donahoe*, 515 F. App'x 561, 571 (6th Cir. 2013). UTK argues that plaintiff cannot show that he was either subject to unwelcome harassment (the second element) or that UTK knew or should have known about the harassment and failed to take corrective measures (the fifth element) [Doc. 35 at pp. 23—24]. UTK contends that the criticisms of plaintiff's work do not rise to the level of unwelcome harassment and were not connected to his medical condition. As to the fifth element, UTK points to Ms. Richter's testimony that plaintiff never complained to her or to anyone else in her office about disability–based harassment [Doc. 34-4 at ¶ 34].[13] Notably, plaintiff does not respond to these arguments at all or otherwise address his hostile work environment claim in any way.

A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule and insult … that is sufficiently severe or pervasive to alter the

---

[12]UTK correctly notes that the elements of a hostile work environment claim, if asserted, would be the same under the ADA. *See Gentry v. Summit Behavioral Healthcare*, 197 F. App'x 434, 437—38 (6th Cir. 2006).

[13]Plaintiff has not disputed that he never complained to UTK of harassment. However, UTK has presented no evidence of a University policy against harassment or other preventive or corrective opportunities as required to prove both prongs of this element. *See, e.g., Theus v. GlaxoSmithKline*, 452 F. App'x 596, 601 (6th Cir. 2011) (in a sexual harassment case, "[employer] has also established that it took reasonable care to prevent sexual harassment by having a written, properly disseminated anti-harassment policy"); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005) (in the Title VII context, "in determining whether [employer] took reasonable care in preventing and promptly correctly the alleged sexual harassment in this case, we must look not only to [employer's] sexual harassment policy … but also to its implementation of that policy").

conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Moreover, the purported harassment must be "because of the employee's protected status." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007); *Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005) ("[t]here is no evidence that [plaintiff] was ridiculed or insulted because of his medical condition"); *McDonald v. Potter*, No. 1:06-CV-1, 2007 WL 2300332, at *58 (E.D. Tenn. Aug. 7, 2007) (Lee, M.J.).

Plaintiff testified that he was told, "You're taking too long to do this," and then "Well now you're doing it too fast, you must not be doing your job right," or "You must not be doing things thoroughly" [Doc. 34-1 at p. 12]. He claims a supervisor told him he "should just quit, that I would be better off to just quit" [*Id.*]. Further, he was told, "you're just not interested in doing your job," "[y]ou just don't care about doing this," "[y]ou just don't care about any of this, you're not doing your job," and "[y]ou don't want to, you're just lazy" [*Id.*]. Assuming the truth of plaintiff's testimony, none of these remarks reference plaintiff's medical condition. While the "you should just quit" comment might be considered insulting, it is not linked to plaintiff's protected status. Further, "conversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress." *Plautz*, 156 F. App'x at 819 (quoting *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998)). The Court finds that no reasonable trier of fact could find that plaintiff suffered from a hostile work environment and therefore UTK is entitled to summary judgment on this claim.

C.    <u>Whether Plaintiff Can Establish a Prima Facie Case of Retaliation</u>

Plaintiff asserts that his termination was in retaliation for complaining about discrimination in violation of the Rehabilitation Act and the ADA.  Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]."  42 U.S.C. § 12203(a); *see* 29 U.S.C. § 794(a) & (d) (incorporating ADA standards into the Rehabilitation Act); 29 C.F.R. § 33.13.  A plaintiff need not actually be disabled to assert a claim of disability retaliation.  However, the plaintiff must have a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA.  *Barrett v. Lucent Tech.*, 36 F. App'x 835, 840 (6th Cir. 2002).

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must demonstrate: (1) he engaged in protected activity; (2) his engagement in that protected activity was known to his employer; (3) his employer, thereafter, took an adverse employment action against him; and (4) a causal link exists between his engagement in the protected activity and the adverse employment action.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *Spence*, 515 F. App'x at 572 (applying same factors under the Rehabilitation Act).  The only *prima facie* element challenged here, the causal connection, requires a plaintiff to produce sufficient evidence to infer that an employer would not have taken the adverse employment action had the plaintiff not engaged in a protected activity.  *Barrett*, 36 F. App'x at 841.  "A causal connection may be shown by direct evidence or by knowledge of the complaints on the part of the employer coupled with a closeness in time sufficient to create an inference of causation."  *Id.*  "[W]here an employer treats an

employee differently after she asserts her rights under the ADA than before she had done so, a retaliatory motive may be inferred. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105–06 (6th Cir. 2005); *Walborn v. Erie County Care Facility,* 150 F.3d 584, 589 (6th Cir. 1998).

Plaintiff sent a complaint to UTK's Human Resources Office on July 24, 2014 in which he complained of "discrimination, unfair treatment and targeting, corruption and lies" and related a series of events concerning his health and attendance [Doc. 37-17]. In support of its argument on the lack of causation between this complaint and plaintiff's termination on February 11, 2015, UTK points to plaintiff's testimony that "[t]he evidence I have is the paperwork that shows an increase in the amount that things [sic] have taken place with these write-ups and these accusations" and that Ms. Rhea's scrutiny of his performance "continued on" after his complaint of discrimination [Doc. 34-1 at pp. 25—26]. UTK contends that plaintiff's subjective, unsubstantiated beliefs are not evidence and are insufficient to demonstrate a causal connection [Doc. 35 at pp. 19—20].

Although the burden of establishing a prima facie case of retaliation is "not onerous," the plaintiff must "nevertheless establish but-for causation at both the prima facie and pretext stages of the *McDonnell-Douglas* framework." *Adamov v. U.S. Bank Nat'l Ass'n*, No. 16-5458, 2017 WL 902141, at *3 (6th Cir. Mar. 7, 2017); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767, 770 (6th Cir. 2015) (en banc). In light of the nearly seven month lapse between plaintiff's complaint and his termination, the Court finds that plaintiff cannot rely on temporal proximity, but must present other evidence of retaliatory conduct to show causation. *See Adamov*, 2017 WL 902141, at *4; *Montell v. Diversified Clinical*

*Servs., Inc.* 757 F.3d 497, 505—06 (6th Cir. 2014); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four-month period between protected activity and discharge is insufficient to support an inference of retaliation). Plaintiff does not directly respond to UTK's causation argument, but instead points to numerous events which he claims are evidence of retaliation and/or pretext [Doc. 37 at pp. 8—25] and which UTK contends are not credible evidence of pretext [Doc. 39 at pp. 4—8].

Because the same circumstances which establish a causal connection between the protected activity and the adverse employment action may serve as sufficient evidence of pretext, the Court next considers whether plaintiff's proffered evidence of retaliation shows causation and pretext. *Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 107 n.2 (6th Cir. 2005) ("The overlap between the causal connection requirement and a showing that the proffered reason for termination was not the actual reason is implicitly recognized in our case law, which permits both to be proven by the same type of evidence.").

D.     UTK's Legitimate Non-Discriminatory Reason

UTK argues that it has presented "overwhelming evidence" that plaintiff was terminated for a legitimate non-discriminatory reason, his poor job performance [Doc. 35 at pp. 21—22]. The record establishes that UTK received complaints about the quality of plaintiff's performance from multiple sources and that his supervisors documented their own observations of his performance. The record also reflects, through several years of performance evaluations, that plaintiff's performance did not meet expectations well before his complaint of discrimination and request for accommodation. Plaintiff does not dispute that UTK has presented a legitimate, non-discriminatory reason for his termination.

Rather, plaintiff responds that the reason is pretextual, both as to his claims of disability discrimination and retaliation [Doc. 37 at pp. 22—25].   The Court finds that UTK has articulated a legitimate non-discriminatory reason for plaintiff's termination and that reason is supported by evidence in the record.

      E.    <u>Whether the Reasons for Plaintiff's Termination Were Pretextual</u>

To survive a motion for summary judgment, plaintiff need not definitively prove that UTK's reason is pretextual, but rather "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016); *Whitfield*, 639 F.3d at 260. Plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998) (reciting same standard in ADA case).  The Sixth Circuit has cautioned against a formulaic application of this test and described pretext as "a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. … [A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination."  *Chen*, 580 F.3d at 400 n.4; *see Ford Motor Co.*, 782 F.3d at 767 ("[t]o demonstrate pretext, a plaintiff must show *both* that the employer's

proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful") (emphasis in original).

Plaintiff has proffered a series of actions which he contends show retaliation and/or pretext [Doc. 39 at pp. 8—25], which the Court will examine below.

1.     First, plaintiff argues that the pretermination letter for unacceptable attendance on August 5, 2014 [Doc. 37-10], shortly after his complaint of discrimination, is evidence of retaliation [Doc. 37 at pp. 8—9]. Assuming that Mr. Nelson was aware of plaintiff's complaint at the time he sent the pretermination letter, UTK correctly notes that the pretermination process was suspended a few days later, on August 8, 2014.[14]  Plaintiff was placed on leave to engage in the interactive accommodation process with Ms. Richter. Thus, plaintiff suffered no adverse employment action and the pretermination letter was of no effect.

Plaintiff also complains that this attempt to fire him for attendance later "turn[ed]" to poor performance after he returned to work with accommodations [Doc. 37 at p. 23]. However, as noted above, plaintiff's performance reviews document his poor performance for years prior to his termination.

2.     Next, plaintiff argues that Mr. Nelson made "impermissible medical inquiries" when he asked plaintiff for information to confirm the diagnosis of Stiff Man

---

[14]Mr. Herbstritt's July 30 email response to Ms. Richter indicates that he will discuss plaintiff's complaint with Mr. Nelson "and have him talk with Seth to give him the steps he needs to follow" for obtaining an accommodation [Doc. 37-9]. However, it is unclear when Mr. Nelson learned of or received plaintiff's complaint. The Court will assume, for purposes of summary judgment, that Mr. Nelson was aware of the complaint to Human Resources at the time of the pretermination letter.

Syndrome [Doc. 37 at pp. 9—10]. Plaintiff relies on a July 30, 2014 email from Mr. Nelson to Mr. Herbstritt stating that he [Mr. Nelson] "spoke with Seth today regarding us not having any statement of his accommodations. He said that he is going to his doctor on August 4th and will bring in a statement" [Doc. 37-12]. Plaintiff also points to Mr. Herbstritt's testimony that Human Resources would "discourage" supervisors from asking about FMLA medical certification and would further "recommend" that supervisors refer employees to the Office of Equity and Diversity on questions of reasonable accommodation. UTK correctly notes that the ADA regulations explicitly permit an employer to request medical information in support of a request for reasonable accommodation. *See* 29 C.F.R. § 1630.14(c). Although UTK – and plaintiff – may prefer that all medical information be passed through designated channels, Mr. Nelson's inquiries were not "prohibited" or "impermissible." More importantly, the record reflects that UTK Human Resources handled plaintiff's FMLA certification process and the Office of Equity and Diversity worked through the accommodation process with plaintiff and both of these processes occurred many months before plaintiff's termination.

Plaintiff also points to his August 2012 letter to Vice Chancellor Irvin [Doc. 37-15] complaining that he was denied a pay raise due to low performance review scores and that his performance had suffered because of his Stiff Man Syndrome. Mr. Irvin did not refer this complaint to Ms. Richter because plaintiff had not provided confirmation of his diagnosis and plaintiff considers this another example of an improper medical inquiry [Do. 37 at pp. 10—11]. Even accepting plaintiff's characterization of this as a medical inquiry, plaintiff has presented no evidence that it was anything beyond what the ADA expressly

permits.  Moreover, this occurred nearly two years prior to plaintiff's termination and is therefore too remote to be evidence of causation or pretext.

3.      Next, plaintiff complains that his supervisory chain of command, Mr. Nelson, Mr. Caudill, and Mr. Irvin, were angry about accommodating plaintiff [Doc. 37 at pp. 11—14].  Plaintiff asserts that several email exchanges among Ms. Richter, Mr. Caudill, Mr. Nelson, and Mr. Irvin reflect their opposition to accommodating plaintiff. Even if his supervisors' attitude is characterized as "forced" or "very reluctant[] to even accept the things that were accepted" as plaintiff testified, the record reflects and plaintiff admits that UTK fully accommodated him [Doc. 34-1 at p. 26].  The supervisors' displeasure in doing so does not rise to the level of retaliation.

4.      Plaintiff also complains that he was placed on unpaid leave during the reasonable accommodation process and that this was an adverse employment action [Doc. 37 at pp. 14—16].  Plaintiff further notes that he remained on unpaid leave for one month after his supervisors agreed on accommodations.[15]  Thus, although not articulated as such, plaintiff appears to be complaining about both the fact that he was not paid during this period and the length of time the interactive process took.  UTK responds that plaintiff never asked to return to work during the accommodation process and that if he had any accrued paid sick leave he could have used it.  Further, UTK notes that neither the ADA

---

[15]Plaintiff's brief suggests that his supervisors "agreed" on the accommodations on September 11, 2014, but that he remained on unpaid leave for another month [Doc. 37 at p. 16].  This timeline is inconsistent with the documents in the record.

nor the University's Human Resources policies required that plaintiff be paid during the accommodation process [Doc. 39 at pp. 5—6].[16]

The ADA regulations stipulate that, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Plaintiff has cited no statutory or regulatory authority or UTK policy that would require UTK to pay plaintiff while engaging in the interactive process.

The EEOC guidance on the reasonable accommodation process instructs that the interactive process "should proceed as quickly as possible." U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance: Reasonable Accommodation & Undue Hardship Under the Americans with Disabilities Act, No. 915.002, 2002 WL 31994335, at *10 (2002).[17] Factors to be considered in "whether there has been an unnecessary delay in responding to a request for reasonable accommodation … include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer each

---

[16]The record does not contain an official UTK "policy" on reasonable accommodations, although the process is described generally in the testimony of Ms. Richter. She explains that she "obtain[s] information about job responsibilities from departments, medical information about employees' capabilities and limitations, and determine[s] what, if any, accommodations would be reasonable under the circumstances" [Doc. 34-4 at ¶ 2].

[17]The Court notes that the EEOC's Enforcement Guidance is not binding authority, but does represent a "body of experience and informed judgment" which may be used as guidance or persuasive authority. *See Lee v. City of Columbus, OH*, 636 F.3d 245, 256 (6th Cir. 2011) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 812 (6th Cir. 2004) (en banc)).

contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was simple or complex to provide." *Id*. at *10, n.38.

Ms. Richter's testimony indicates that she first met with plaintiff on August 15, 2013, long before his July 24, 2014 complaint, to discuss his physical limitations and potential accommodations [Doc. 34-4 at ¶¶ 6—7]. Although they had further email communication, Ms. Richter did not receive the ADA Accommodation Certification form from plaintiff's physician until April 14, 2014 [*Id*. at ¶¶ 10—13]. Notably, plaintiff's physician initially reported that *no* possible accommodations could improve his job performance [*Id*. at ¶ 16]. After being directed to do so, plaintiff and Ms. Richter met again on August 14, 2014 to discuss potential accommodations [*Id*. at ¶¶ 17—22]. Ms. Richter requested supplemental documentation from plaintiff's physician and received it on September 18, 2014, from which she concluded that plaintiff could perform his duties with additional rest breaks and a modest amount of additional leave [*Id*. at ¶¶ 24, 29], accommodations which would be simple and inexpensive to implement. The record reflects that, during the interim, Ms. Richter was communicating with plaintiff and his supervisors about possible accommodations. She then confirmed the accommodations with the Facilities Services department and with plaintiff on October 6, 2014. It appears that the supervisors met with Ms. Richter on October 9, and Mr. Nelson's October 10, 2014 letter instructed plaintiff to report for work on October 13, 2014 [Doc. 37-25].

Although the interactive process did not proceed "as quickly as possible," the Court cannot conclude there was unnecessary delay. Prior to receipt of the supplemental information from plaintiff's physician, UTK only knew that plaintiff had physical

limitations and there were no possible accommodations to assist him in performing the functions of his job. There is no explanatory reason for the delay between the receipt of his physician's supplemental information on September 18, and Ms. Richter's email of October 6, 2014. However, in light of the fact that UTK accommodated plaintiff, that he admits he received all the accommodation he needed, and that he returned to work, the Court does not find that this delay was retaliatory in nature.

5.    Plaintiff contends that he was subject to "increased scrutiny, immediate discipline, and false allegations" upon his return to work [Doc. 37 at pp. 16—17]. This allegation concerns Ms. Rhea's assessment of his performance and his disagreement with her assessment. As UTK correctly points out, a plaintiff's subjective opinion of his own performance is "irrelevant as a matter of law." *Mynatt v. Lockheed Martin Energy Sys., Inc.*, 271 F. App'x 470, 477 (6th Cir. 2008) (citing *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)). Moreover, Ms. Rhea's assessment of his performance is of the same tenor as the evaluations of his performance by prior supervisors. Therefore, Ms. Rhea's comments are not evidence of retaliation.

6.    Next, plaintiff complains that UTK deviated from its progressive disciplinary policy by issuing him a final written warning for poor performance on October 20, 2014, without first issuing him an oral warning and a written warning [Doc. 37 at pp. 18—19].[18] However, as Mr. Herbstritt testified, there is no "hard and fast rule" that discipline may only be imposed in that order. "You can skip the oral and go to the written, or you can go

---

[18]The Court observes that no written disciplinary policy is contained in the record.

directly to a final, depending on the circumstances of the situation" [Doc. 39-1 at p. 2]. Mr. Nelson states that he issued a final written warning "to convey to Cannon that his performance deficiencies were too great to be addressed through the normal three-step disciplinary process" [Doc. 34-2 at ¶ 29]. Plaintiff has presented no evidence that the policy was not uniformly applied, *i.e.*, that other Service Aides received an oral or written warning for poor performance before receiving a final written warning. Moreover, plaintiff suffered no significant change in employment status, significantly different responsibilities or benefits, or tangible job consequences as a result of this final written warning. *See Foust v. Metropolitan Sec. Servs., Inc.*, 829 F. Supp. 2d 614, 627 (E.D. Tenn. 2011) (Varlan, J.); *Andrews v. Lockheed Martin Energy Sys., Inc.*, No. 3:06-CV-42, 2006 WL 2711818, at *11 (E.D. Tenn. 2006) (Phillips, J.). He continued to be employed as a Service Aide and he received two more final written warnings before his eventual termination. This warning does not constitute an adverse employment action and is not evidence of retaliation.

7.     Plaintiff contends that UTK's failure to return him to work for over a month after a minor workers' compensation injury is evidence of retaliation [Doc. 37 at pp. 19].[19] The record reflects that plaintiff injured his right ankle at work on October 31, 2014. He provided UTK with a doctor's note dated November 3, 2014, which stated that he could return to work on that day, but that he must use crutches [Doc. 37-29]. Mr. Nelson informed plaintiff that he needed to provide additional information from a doctor as to his

[19]Plaintiff claims that the testimony shows that UTK generally allows employees to return to work within one day of receiving the doctor's note [*see* Doc. 37 at p. 19]. This is not quite correct. Mr. Caudill testified that employees are generally allowed to begin light duty work on the same or next day as "they present the restrictions" [Doc. 37-13 at p. 9].

limitations [Doc. 39-2 at ¶ 4].  Mr. Nelson received a note on December 8, 2014, from which he concluded that plaintiff could return to work on light duty [*Id*. at ¶ 5].  On December 9, 2014, Mr. Nelson advised plaintiff that he could return to work on December 10, 2014 and he did so [*Id*.].  Thus, the delay in plaintiff's return to work was due to UTK waiting for documentation of plaintiff's limitations and not due to retaliation.

8.      Plaintiff next asserts that UTK violated the accommodations and/or department policy by issuing a final written warning for his absences on December 16 and 18, 2014 to attend doctors' appointments [Doc. 37 at p. 20].  Plaintiff contends that this warning was retaliatory because he provided advance notice of the appointments and he had enough accrued leave to cover the absences [*Id*.].  Mr. Nelson's warning acknowledges that plaintiff informed his supervisor of the appointments, but notes that plaintiff did not return to work after the appointments [Doc. 34-2 at p. 33].  After plaintiff contested the discipline, UTK decided to give plaintiff "the benefit of the doubt" that his absences fell within the intent of the ADA accommodations and he was paid for both days [Doc. 34-2 at pp. 37—38].  Mr. Nelson's response emphasized that the written warning for attendance was ultimately of no impact because he was being considered for termination due to unsatisfactory work performance.  Thus, plaintiff suffered no adverse action as a result of the attendance warnings.

9.      Plaintiff complains that Ms. Rhea "maliciously sabotaged" him by producing pictures which purportedly showed that he did not clean his assigned areas [Doc. 37 at pp. 20—21].  Plaintiff disputes that the pictures accurately represent his work area after he cleaned and claims they were taken hours or days later.  As noted previously, plaintiff's

43

subjective opinion of his own performance is "irrelevant as a matter of law." *Mynatt*, 271 F. App'x at 477.

10.     Next, plaintiff asserts that multiple instances of discriminatory animus show that UTK's legitimate non-discriminatory reason is pretextual [Doc. 37 at pp. 22—23].  He points to Mr. Caudill's July 30, 2014 email comment that "[plaintiff] causes me pain, can I get FMLA and lay out for a year or so?" and Mr. Nelson's response that "[a]t lunch he walks with a cane and smokes.  Great image" [Doc. 37-32].  Plaintiff also points to Ms. Rhea's October 24, 2014 email in which she discusses his pain medication and comments that "[n]o wonder he walks, talks, and looks like he does. He is stoned out of his gourd every day" [Doc. 37-33].[20]  UTK contends that the emails may be "inelegantly worded," but are merely a reflection of the supervisors' frustration with plaintiff's "persistent poor performance and attendance" rather than evidence of a discriminatory animus [Doc. 39 at p. 3].

In assessing the probative value of such remarks as evidence of pretext, the Court must consider the declarant's position in the organization, the purpose and content of the statements, and the temporal connection between the statements and the challenged employment act.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998).  These remarks were made four (Ms. Rhea's) to six months (Mr. Caudill's and Mr. Nelson's) prior to plaintiff's termination and are not so close in time to show temporal

---

[20]The Court observes that UTK has devoted several pages of its opening brief [Doc. 35 at pp. 3—4] and submitted numerous medical records regarding plaintiff's use of and purported addiction to narcotic pain medication [Doc. 35-11 through 35-16], perhaps in an attempt to color the Court's impression of the plaintiff.  This issue does not appear to be relevant to the instant motion.

proximity. Mr. Nelson's and Mr. Caudill's remarks are certainly derogatory and were made in the context of waiting for plaintiff's medical information on potential accommodations.[21] The record reflects that Mr. Nelson made the decision to terminate plaintiff's employment, although he admittedly relied in part on Ms. Rhea's evaluation of plaintiff's performance [Doc. 34-2 at ¶¶ 48—49]. Thus, the isolated remarks by Mr. Caudill and Ms. Rhea are not connected to the adverse employment action. *See Suits v. The Heil Co.*, 192 F. App'x 399, 407 (6th Cir. 2006) ("stray remarks, particularly those made by a person other than a decision-maker, are not enough to show discrimination"). More importantly, none of these statements were made in connection with the decisional process to terminate plaintiff. *See Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 118 (6th Cir. 2007); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). On balance, the Court does not find that these remarks are evidence of pretext.

11.   Finally, plaintiff complains that the positive letters regarding plaintiff's job performance – from Mr. Kredich, Ms. Anderson, Ms. Brown, and Mr. Anderson [Docs. 37-34, 37-35, 37-36, and 37-37] – were not shared with his chain of supervisory command in contrast to the letters of complaint [Doc. 37 at pp. 24—25]. Notably, all except for the email from Tom Anderson were sent six months or more prior to plaintiff's termination and are not evidence of temporal proximity. Further, this evidence does not refute UTK's honest — and well documented — belief that plaintiff was not meeting performance

---

[21]Plaintiff suggests that Mr. Caudill's remark is evidence of "animus against his use of FMLA" [Doc. 37 at p. 22]. However, as set forth above, plaintiff had long since exhausted his entitlement to FMLA leave at the time of Mr. Caudill's email and there is simply no evidence to support an inference that his use of FMLA leave was connected to his termination almost one year later.

expectations for several years. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[a]n employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made'") (quoting *Smith*, 155 F.3d at 807). "[T]he plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citations omitted). More importantly, these letters of support do not show that his poor performance was not the real reason for his termination *and* that discrimination or retaliation was the true reason. *Ford Motor Co.*, 782 F.3d at 767.

In conclusion, the Court finds that plaintiff has failed to present evidence showing a causal connection between his complaint of discrimination and his termination or that the reason for his termination was a mere pretext for discrimination or retaliation. Accordingly, the Court finds that UTK is entitled to summary judgment on plaintiff's ADA claims.

## V.      Conclusion

Upon review of the record, the Court cannot determine if plaintiff *could not* do his job, even with accommodation, or *would not* do his job. However, it is clear that UTK had substantial evidence to support its decision that he *did not* do his job and this decision was unrelated to his prior use of FMLA leave or his medical condition and request for

accommodation.  Thus, the Court finds there are no genuine issues of material fact in dispute and that UTK is entitled to summary judgment on all of plaintiff's claims.  An appropriate order will enter.


    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE